Okay, will the attorneys please step up to the podium. Tell the court your name, who you represent, and approximately how much time the argument will take. Counsel, will you step up as well, please? Good morning, Your Honor. My name is Joseph Vogel, F-O-G-E-L, and I represent the Plaintiff Appellant, Indeck Power Equipment Company, Inc. I would expect our opening argument to take approximately 20 minutes, and we'd like to reserve 10 minutes for rebuttal, if that's okay with the court. What about 20 and 5, Counsel? Okay. Very good. Good morning, Counsel. Good morning, Your Honor. My name is Jeffrey Rosenberg, and I represent the Defendant Appellee, Professional Power Products, Inc. Your Honor, I expect to take at most 20 minutes, likely a little less. Very good. All right, let me advise the parties at the court. The judges have read the briefs, and I would simply suggest that you get to your best argument and focus on that argument, rest on the briefs for the remainder of the arguments. But please proceed, Mr. Vogel. Thank you, Your Honor. May I grab that paper? Yes, certainly. Mr. Baum. May it please the Court? I will cut right to the chase of our key arguments here. When the trial court ultimately ruled and granted Professional Power's motion for judgment, it did so only after having made what we think were three very serious errors. The first, it denied INDEC its constitutional right to a jury trial on count one. Second, it excluded critical evidence of other generator sets that were identical to the generator sets in the INDEC units, which would have proven that the INDEC generator sets were defectively designed, which is exactly the theory that we tried to present at trial. And then finally, that the trial court erred in refusing to consider that the third and fourth party defendants, Inland, Kohler, and Detroit Diesel, were not party opponents to INDEC, simply because INDEC didn't have pending claims against them and couldn't have brought claims at the time because of statute of limitations issues. On the first issue, the jury trial, the parties agreed that the substance of the claim, not the title that a party places on it in a complaint, controls whether a party has a constitutional right to a jury trial. By substance of the claim, do you mean the allegations in the complaint? Correct. Okay. And the parties also agreed that a claim which in substance alleges a breach of contract and seeks contract-based damages is an action cognizable in common law and therefore entitles a party to a jury trial. The fact that we called count one and we did, contractual rescission, is irrelevant to the substance of the allegations which plainly allege a breach of contract. Equitable rescission would have required the court to exercise discretion to cancel the contract. We were seeking to enforce the express terms of the contract. We were asking for a remedy that required the court to affirm the contract and to enforce its express terms. In particular, paragraph 15 allowed INDEC to return the units, generator packages, in return for the purchase price and all amounts that it paid. And we sought recovery of the purchase price as well as interest that had been used to finance the purchase of the goods because the contract said all amounts paid therefore, as well as attorney's and expert's fees, specifically under paragraph 23 of the contract. Had this been a case of equitable rescission, which it was not, there would not have been a right to attorney's fees. There would not have been a right to expert fees. It depended upon enforcing the contract, not voiding the contract. And therefore, it was a breach of contract case, plain and simple. And we think that the trial court, in effect, exalted form over substance in finding that it was a rescission claim, it was an equitable claim, and thus deprived INDEC of its constitutional right to a jury trial on count one. Now, I'm going to turn to the evidentiary issues I mentioned at the outset. And first, on the exclusion of the other generator set evidence. The trial court excluded a very substantial body of critical evidence proving a design defect in the identical model of generator sets that were contained in the INDEC units. That evidence would have proven that the INDEC units were defectively designed and certainly that evidence would also have demonstrated that professional power was on notice as early as 2001 or 2002 of vibration problems on those identical model of generator sets and thus had notice of the very issue the trial court claimed INDEC failed to provide professional power with notice of. And so in ruling, the court specifically refused to admit that evidence on the ground that the court said the evidence was not relevant to proving a design defect. That ruling was wrong as a matter of law. Every case to address the issue has held that other similar accidents or similar products are relevant if they're substantially similar to prove a design defect. That's exactly what they're relevant for. Later in the trial, when we were making offers of proof, the trial court actually acknowledged that the other generator set would have been admissible if this had been what he called a negligent design case. And we think that that comment is very important for a couple of reasons. First, it suggests to us that the trial court may have understood the error it had made earlier because even in a negligent design case, the other generator set evidence would only have been admissible if the other generator sets were substantially similar. They still had to be substantially similar to come in. And second, and even more critically, the court didn't appreciate the fact that the INDEC case, the complaint, and all the evidence we tried to introduce at trial was to prove the existence of a design defect. This was a design defect case. We alleged that the combination of the engine and the generator, which makes up the generator set, combined to produce a defective design that resulted in vibration that effectively caused this equipment to self-destruct. That was our theory, and our offers of proof, we believe, would have convincingly proved that theory through this evidence of other generator sets. In the Mihailovich case, which is a Seventh Circuit case applying Illinois law, the court specifically held that, and I'm quoting, the particular defect or danger alleged by the plaintiff will serve to define the degree of commonality that there must be among the accidents in order for them to be considered substantially similar. What that means is that what the trial court should have looked at in determining substantial similarity was the generator set component, which was our theory of defect, which was effective. Had the trial court done that, it could have come to no conclusion other than the fact that they were substantially similar. In fact, they were identical. They were the same model, same model of engine, same model of generator. They were all manufactured the same and assembled the same. The offers of proof would have demonstrated that the root cause of the vibration problems with the other generator sets was identical to that which INDEX sought to prove as to its units. The design changes that Kohler made to the INDEX units, that is changing them from a soft mount vibration system to a hard mount system and replacing what was a six and a half inch exciter to the five inch exciter, were driven by its experience with the very other generator sets that we sought to admit. It makes no sense to change the INDEX units based on your experience with the other generator sets unless you believe they were at least substantially similar, if not identical. With the ten that were delivered, weren't some of them mounted hard and some of them mounted soft? Your Honor, as delivered, they were all mounted soft, and then the design change that Kohler directed was to change it from the soft mount to the hard mount. The component failures, just continuing in the evidence, what the evidence would have shown as to how they were substantially similar, the component failures on the other generator sets and the INDEX generator sets were the same. Vibration testing data was taken on the INDEX units compared to the vibration testing data taken on these other generator sets. Again, something you don't do unless they're substantially similar. I think we've read every case or almost every case in Illinois that addresses the substantial similarity doctrine, and we haven't found one where the goods or accidents at issue were more similar than the goods involved in this case. They were the same. And maybe that's why professional power, when it filed its motion for summary judgment, acknowledged, and these are its words, that the generator sets and the two sets of units, the INDEX units and the others, were, quote, identical, and, quote, possessed the exact same defects as those alleged by INDEX. So what you're asking the court to do is to hold that the trial court abused its discretion by excluding this evidence. Correct, Your Honor. Okay. I do think that what I would say, too, is that the trial court, I think, did make an error of law in wrongly applying the incorrect legal standard, but I think the debate between professional power and INDEX over the standard review here is less important when it involves a court not applying the law correctly, because failure to apply the law correctly under the case law that we've read is an abuse of discretion itself anyway. But what you said is absolutely correct. We are asking that. The trial court's exclusion of this evidence did affect the outcome of the trial, at least in two critical ways. One, because the trial court's ruling, in its ruling, it agreed with professional power's argument that there hadn't been a defect proven. Our offers of proof would have provided very significant detail of testimonial and documentary evidence that would have proven by more than a preponderance of the evidence that the generator sets and the 10 INDEX units were defectively designed. And second, certain of the other generator set evidence would also have proven that professional power had notice of the vibration defect, and thus INDEX could not have been late in providing it notice because it already knew. I'm going to turn now to the court's ruling with respect to the third and fourth party defendants in its conclusion that they were not party opponents to INDEX. We again think the trial court applied the wrong legal standard in holding that Inland Kohler and Detroit Diesel were not party opponents to INDEX, and that ruling precluded INDEX from offering party admissions that would have also proven that the generator sets were defectively designed. Professional power, Inland Kohler, and Detroit Diesel tried this case together as a group. They were joined at the hip because they were asserting a common defense against an attack by INDEX on their product. INDEX, excuse me, Inland's, Kohler's, and Detroit Diesel's liability was wholly derivative of professional power's liability to INDEX. Their liability was 100% a function of INDEX prevailing against professional power. If INDEX could prove no defect in its case against professional power, none of the third or fourth party defendants would have been liable. Likewise, or conversely, if we did prove our case against professional power that they were defective, then professional power's claim against Inland would have prevailed, and Inland's claim against the fourth party defendants, Kohler and Detroit Diesel, would have prevailed. They all shared a common damages and engineering expert for the sole purpose of rebutting INDEX claims. Kohler and Detroit Diesel, the trial record confirms, took the lead across examining many of INDEX's witnesses, and professional power itself admitted that it was in effect relying on them to defend its case against INDEX claims. The trial court ruled that because INDEX had not asserted a claim against the third and fourth party defendants, and at a time of trial couldn't assert a claim against them, it was not a party opponent to them for evidentiary purposes. That was not the correct legal standard. Now, the only case either party cites on this point in their briefs from Illinois is the Zaragoza case at 331 ILAP 3rd, sorry, I don't even have the page reference here, but it's obviously cited in the briefs, and it established that if the parties, and there it was co-defendants, could implicate each other vis-a-vis the Plinkus claim, they were adverse and thus party opponents. Here, the third and fourth party defendants could only be liable if professional power was liable, and INDEX claims therefore implicated and exposed them to liability, just like the co-defendants in the Zaragoza case. The testimony of the third and fourth party defendants has all of the indicia of reliability and trustworthiness because all of these parties had every incentive to defend the integrity of their product from INDEX attack on it. The testimony was by way of deposition? It would have been live witnesses. We would have called if they were party opponents. We could have required them to be present at trial. We would have called them as witnesses. Some of it would have been by deposition as well, Your Honor. So you mentioned testimony. I'm sorry? You mentioned the word testimony. Correct. Was it under oath? Yes. It was the office of proof establishing what they would have testified to was deposition testimony and then documents underlying the deposition testimony that was used during the deposition, that we would have called them as witnesses to testify at trial with the assumption they would be testifying consistent with their prior sworn testimony. Thank you. Counsel, I have a question for you. You wanted to use an alleged admission made by Inland Kohler and Detroit Diesel against professional power products, correct? Correct. Does that make a difference? You're not using it against the party that actually made the statement. I think in this case it does not make a difference for its admissibility as a party admission because of the fact that INDEX claims against professional power implicated and exposed those other parties to liability. And professional power was relying on the evidence INDEX was presenting in its third and fourth party claims up the chain. And so that while the evidence was being used against professional power, professional power sold one big product to INDEX, which contained subcomponents manufactured by the others. Professional power warranted that the product that it received from the others and then sold to INDEX was free of defects. The only evidence that we were – the evidence we were trying to introduce into evidence about its effective design came from those other parties because professional power itself didn't design the product. It wouldn't have had any internal documents about how the product was designed. But the designers of the product, the ones that sold it to professional power and then professional power to INDEX were the folks whose testimony and documents we were trying to admit into evidence at trial. But professional power, in effect, adopted their product. They took it and warranted it as though it was their own. And therefore, we don't think that it matters that the evidence that we would have been seeking to introduce was somebody else's admission against professional power because professional power – because the liability of those defendants depended upon or was implicated, I'm sorry, by INDEX claims against professional power. The – because of the absence of Illinois case law, really directly hitting this issue right on the head, we cited some cases from out of state. And we think one is just – couldn't be more on point than any other, and that's the Fulton Holmes case which we cited. It's 155 P3rd – Pacific 3rd, I should say – 1090. It's a 2007 Arizona case. And it involved a specific question of whether a third-party defendant was adverse to the plaintiff even if there were no claims between them directly. And that's exactly the situation we have here. In referring to an earlier Arizona case called Pioneer Roofing, the court in the Fulton Holmes case said on page 1095 – and I'm going to quote a little portion of it here – Pioneer Roofing addressed the question of adversity between the plaintiff and the third-party defendant. We held that adversity is not determined solely from the party's alignment in the pleadings, but rather must be ascertained from the opposing positions or interests of the parties. As we explained, the third-party defendant's ultimate responsibility for the claims asserted against it rendered it adverse to the plaintiff. The rule involving third-party practice clearly recognizes that third-party defendants are in an adverse position to the party asserting a claim for which they may be ultimately responsible. In other words, even though the plaintiff did not assert a claim directly against the third-party defendant, their interests were adverse. That's exactly the point. That's exactly what we had here. It's entirely consistent with the rationale of the Zaragoza case, and we would urge the court to adopt that rationale in this case. This is frankly, I think, a case of first impression in this court. Indyk, as the plaintiff was claiming that the generators were defectively designed, that was a direct attack on the third- and fourth-party defendant's product. If Indyk prevailed against professional power, the third- and fourth-party defendants would be, in the words of the Fulton Holmes case, ultimately responsible, regardless of whether the plaintiff had sued them directly. As noted, the testimony of the result of the court's ruling of precluding our ability to offer that testimony and the documents into evidence was frankly crippling on Indyk at trial. It excluded admissions that, but for the trial court's ruling, could have been admitted as hearsay exceptions and without personal knowledge and regardless of whether they were in the form of opinions, because they would have been admissions. One example is what was a self-described, quote, confidential memo author or email authored by a gentleman named Dennis Christian, who was a Kohler witness, that admitted that the Indyk generator packages were not, quote, robust enough, end quote, to run at even less than 75 percent of their promised capacity or else they would, quote, come apart, meaning they'd vibrate until they failed. That would have confirmed Indyk's case at trial. That's exactly what we sought to prove in the case. But the trial court granted Kohler's motion to bar that email on the ground that Mr. Christian was a supposed layperson, not qualified to give an opinion, but it might come in if it was a party admission. But because the court had ruled that Kohler was not a party opponent to Indyk, we couldn't get it into evidence. It precluded us from introducing it at trial, and that's evidence that went to the absolute heart of the case that Indyk tried to present. So the effect of the trial court's ruling was to allow professional power on the one hand to rely on Kohler and Detroit Diesel to defend it against Indyk's claims while tying Indyk's hands behind its back by being unable to introduce vast numbers of critically relevant admissions which would have demonstrated that their product was defectively designed. Finally, I'd like to briefly address the trial court's ruling when it granted professional power's motion for judgment. First, as to Count 1, the trial court ruled that the claim was barred by latches and unclean hands. Latches is an affirmative defense that has to be pled. It was never pled. It was waived. The case law is clear that even if the evidence might establish latches, if it hasn't been pled, it's waived, and it's reversible error, frankly, for the trial court to sua sponte find the existence of a defense that had never been pled. It deprives the other party of ever having been able to mount a defense against it or offer evidence against it, and that's exactly what happened here. And even if you accept the proposition that latches could apply, which it can't because it wasn't pled and was waived, the case law is clear that delay is only one part of the equation. You also have to prove prejudice. I mean, there's cases that there's the Spenzos case out of the second district that we cited held that even a 15-year delay without proof of prejudice was not enough to prove latches, and the court reversed on that basis. Professional power never attempted to plead or prove prejudice. The trial court made no finding as to prejudice because there was none pled, none argued, and none proven. The trial court also wrongly applied unclean hands. First off, it only applies to equitable claims, not legal claims. Both of the next claims were legal claims. Second, unclean hands under all of the cases requires proof of fraud or bad faith. Professional power never attempted to introduce any evidence of fraud or bad faith for the simple reason that there was none. Likewise, the court cited no facts in its ruling to support unclean hands. There were no false statements. There were no failures to disclose under a duty to disclose. There was no reliance, no causation, no damages, absolutely no evidence of it, and yet the court ruled on that basis. And then lastly, as to count two, the revocation of acceptance count, the court ruled that INDIC did not timely revoke its acceptance, and we believe that that was also erroneous. Timeliness is measured by agreement of the parties or reasonableness under the Uniform Commercial Code, but professional power can't claim that INDIC delayed in giving it notice of revocation when the delay was induced by professional power's assurances that the generator packages were or would be fixed, were being fixed or would be fixed. In the testimony of INDIC's president, Marsha Forsythe-Fournier, and its chairman, Mr. Forsythe, makes clear that professional power did assure INDIC that the problems with the generator packages had been or would be fixed. The evidence also showed that INDIC kept professional power informed of all the problems with the generator packages. Frankly, professional power was on site at both of the customer sites where the generators were being leased, so it had firsthand real-time knowledge of all the problems. Mr. Trent himself, the president of professional power, testified to his knowledge of vibration-related problems during the second lease to a company called U.S. Sugar that was a sugar refinery in Florida. The evidence at trial demonstrated that until the United States Sugar lease in February or March of 2002, INDIC had not yet seen the product or manifestations of this excessive vibration. The early testing that INDIC observed where they did observe higher levels of vibration, that was done not in a real-world environment. The units were attached to what are called artificial load banks that simply are designed to try to see if the units can reach 2,000 kilowatts of electricity. But in February or March of 2002, INDIC got firsthand tangible information that it had a vibration problem that was causing these units to come apart. It learned about broken parts. The exciter on one unit failed, completely shutting it down, requiring INDIC to take it off the site, supply two more units at no cost to the customer, broken louvers, which are these steel panels at the back of the unit, again, broken metal parts from vibration, broken wires. For the first time, INDIC was seeing these robust steel components shaken so much that they were breaking. It didn't have any prior notice or any indication that the vibration would wreak that kind of havoc. But nonetheless, despite that experience at U.S. Sugar in February or March of 2002, INDIC continued to work with professional power based on assurances that efforts were being made to try to come to fixes. For example, professional power, as the record indicates, supplied what are called reinforced louvers. They were intended to hold up to a greater level of vibration, but they were designed to address a consequence of the vibration, not the cause of the vibration. So that was not an adequate resolution of the problem. Then in late June of 2002, Kohler did some vibration testing on one of the INDIC units when Representative INDIC, Mr. Norwick, and a representative of Inland were present, and both believed from their observations that the units continued to vibrate excessively. And after some additional efforts to try to fix them, ultimately INDIC came to the conclusion that a fix wasn't going to happen, and in January of 2003, it gave professional power formal notice of revocation of acceptance. But the time gap between when INDIC first learned of the damage being caused by the vibration, February or March of 2002, and the date it provided the formal notice of revocation was at most 10 to 11 months. And during that 10 to 11 months, additional efforts at trying to fix the problem were still being had. The North American Lighting case, which is a Seventh Circuit case applying Illinois law that we cite, makes clear that when a party assures a party that it is fixing a problem, the time to invoke the revocation of acceptance remedy is essentially told. There, the plaintiff in that case had waited over two years from when it knew it had grounds to revoke acceptance, which the court found was still timely. At most here, INDIC waited 10 or 11 months. And during that time, again, as I mentioned, the efforts were being made to diagnose and fix the problem. And finally, regardless of all of that, professional power, again, never attempted to prove any prejudice from the untimeliness of notice, either in Count 1 or Count 2. So in sum, we believe the trial court deprived INDIC of its constitutional right to a jury trial on Count 1, made erroneous evidentiary rulings on critically relevant evidence that went to the heart of the case, and then made legal and factual errors when it made its ultimate ruling. The court's errors permeated virtually every aspect of the case, from who the trier of fact was to what evidence would be offered and through which witnesses it could be offered. Put simply, INDIC did not receive a fair trial, and a review of the record amply confirms that. We would therefore ask the court to grant INDIC a new trial before a jury on Count 1, a new trial on Count 2, and with directions on remand that the other generator evidence would be admissible, and the third and fourth party defendants are party opponents for evidentiary purposes. Thank you, Your Honors. And you are reserving five minutes? Yes, Your Honor. I hope I've saved it. Yes. Okay. That's fine. Mr. Global, thank you. Thank you. Mr. Rosenberg, one second before you start. Okay. Please proceed. Good morning. Good morning. Please, the court again. My name is Jeffrey Rosenberg, and I represent the defendant, Appellee Professional Power Products, Incorporated. Your Honor, I'm going to start with the ruling on May 3, 2010, by the trial court, granting Professional Power's motion for judgment and dismissing INDIC's complaint in whole. That is, of course, the main reason we are here today. There is no question that the main basis for the court's ruling there was that INDIC, the plaintiff, did not provide reasonable or proper notice of its intent to rescind the contract to the defendant, Professional Power. The evidence in that regard is overwhelming, and I won't go over all of it. In brief, INDIC knew of the vibration levels, which it claims was the only defect on these generator packages. It knew of it prior to acceptance. It knew of it right after acceptance when it tested in its own facility. It knew of it during the first lease, during Black Hills. It knew of it in between the first lease and the second lease. It knew of it during the second lease. There was a period of nearly two years, Your Honor, where INDIC is observing these machines. Don Norwick, INDIC's agent, is observing the machines. He's actively involved in testing them. He's testing them themselves. He's seeing them in the field. They're complaining about certain problems that arose. There's no question that INDIC was aware of a defect. The judge reviewed the credibility of the testimony, and there was no dispute as to his finding that there was not proper notice. Likewise, there is no evidence that INDIC provided notice of this vibration defect to Professional Power. INDIC never, through Don Norwick, through Jerry Forsythe, through Marsha Forsythe, its president, never said to Professional Power, There's a vibration defect here. There's a problem with these machines. We're not going to be able to release these out. These are unfit for the purpose that you sold them for. You need to fix the vibration. You need to change the mounts back. The mounts that Your Honor mentioned were a big factor here. They never said you need to change the mounts back. They never said you need to test for vibration levels. INDIC never even required a test for vibration levels. They never tested them on their own. There's no dispute that there was never a notification to Professional Power of this vibration, so-called purported defect. Now, what Counsel also mentioned is that Professional Power never assured INDIC that it would fix the vibration, so-called vibration problems on this machine. INDIC cited in its brief, and Counsel mentioned here today, an interesting case, North American v. Hopkins. That case is interesting. It's distinguishable, but interesting in that that is what INDIC should have done. The plaintiff in that case purchased some equipment, and it knew at the time of purchase there was a defect, just like INDIC purportedly did. And what did the plaintiff in that case do? It didn't sign a paper saying everything's okay, take the equipment, and proceed to work it and lease it out. What the plaintiff in that case did was, A, withhold some of the payment, and, B, it expressed written and verbal assurances from the defendant, the seller, that those problems that were evident upon the purchase would be fixed. So, in other words, if there was truly a vibration defect here, INDIC would have needed to say to Professional Power, Okay, we'll take these generator packages, but you need to promise us, verbally and in writing, that you're going to change the mounts, that you're going to make sure the vibration levels come back into a agreed-upon level, that you're going to do something regarding the vibration levels. Your Honors, that never happened. Those products were sold, INDIC accepted them, they certified that they were okay, and at no point, even until nearly two years later, was there a request to change the vibration to do something about the vibration levels. There was no assurances by Professional Power. If you look at INDIC's brief, Your Honors, there is some statements and counsel made here today that Professional Power assured INDIC things would be fixed. If you look at those representations, they are utterly vague. There is no representation as to who made a statement, as to when a statement was made, as to exactly what was said. These are vague statements that clearly do not come anywhere near approaching the level needed to provide the requisite assurance to eliminate INDIC's need to notify Professional Power of a defect. And Your Honor, it was on that basis that the trial court ruled in favor of Professional Power and its motion for judgment. INDIC's claim was one of rescission, which I'll get to in a moment, but the trial court held that INDIC's claim was one of rescission. What is the essential requisite element for a rescission claim? Notice. It needs to be pled. It needs to be proven. And in fact, INDIC did plead that claim. They pled in their complaint that they provided proper notice to Professional Power of rescission and of a defect. However, they did not prove it. That alone supports the trial court's ruling on count one of INDIC's complaint. Now, the appellate court can, of course, affirm on any grounds set forth in the record, but that is what, and whatever the trial court used, whether it used the word lachis or not, that is what he was granting Professional Power's motion for judgment on, the lack of notice. He also mentioned as a secondary issue that INDIC did not prove that the generator packages that it purchased were defective. And he gave multiple reasons in that effect, and that is a good secondary reason. Those are really the two things INDIC needed to prove, notice and substantial impairment. INDIC did not prove that there was a substantial impairment. They did not prove that, again, vibration was the only defect INDIC mentioned. INDIC did not prove that the vibration levels were substantial impairment that caused the generator packages to not be suitable for the purposes intended. Remember, INDIC leased these machines out twice. INDIC made $2.5 million in less than a one-year period on these machines. The first lease for six months, the products were there for six months. They didn't stop in the middle, like in the North American case. They worked for six months, and then they were brought back. There was another lease for three months, three-month period, and they were brought back. The cancellation is also a red herring, Your Honor. The trial court found many Black Hills, the first lease was canceled. The trial court found many red herrings involving INDIC's involvement, almost incestuous relationship with Black Hills, the fact that Black Hills requested a cancellation clause, which was unlike any other INDIC leases, and the fact that INDIC really didn't, or I'm sorry, that the leasee didn't really want these things for the winter. So the trial court gave no real credence to the fact they were canceled. He gave credence to the fact that they worked for six months in the heat, the altitude of Black Hills, South Dakota. Likewise, they were moved to the swamps, the Everglades of South Florida. They again worked fine. There were multiple thousands of hours put on these generator packages and only two leases. These machines were working fine, Your Honor. And INDIC knew it, both subjectively, as evidenced by the fact that they never made a complaint, they never made internal communications. There was a problem with these machines. They never talked to professional power. You've got to fix the vibration. Much subjective evidence that INDIC didn't believe they were. The objective evidence is the same. It's evidenced by the fact that a massive amount of hours put on the machines, the fact that there were a lot of testimony by Don Norwick. Yes, after I started them up at U.S. Sugar, which is the Florida lease, they ran fine. There was one problem. We replaced the machine. The replacement ran fine. The problem had happened to INDIC before. There is the objective evidence in the totality, ending with the fact that, again, INDIC made millions of dollars on these leases, shows that these generator packages were not substantially impaired, far from it, and they were suitable for the purposes intended, intended to provide power, which they did. So, therefore, the trial court clearly and properly ruled on count one of INDIC's complaint that it did not provide proper notice of rescission, did not prove there was a defect allowing rescission, and, therefore, dismissed that count. Count two is essentially the same, revocation of acceptance. These are generally the same counts, Your Honor, and have the same elements. Revocation of acceptance, did INDIC provide proper or reasonable notice under the UCC, Section 607 of the UCC? No, for all the reasons I just mentioned, INDIC did not. And, again, were the generator packages substantially impaired? Again, no. It's the same evidence and it's the same ruling by the trial court. The trial court properly ruled on count two of INDIC's complaint, dismissing that count and granting professional powers motion. Let's turn to some of the evidentiary issues that INDIC discussed. The jury trial is obviously an important issue. I think INDIC talks about a de novo review often. This is, I think, the only case where the court needs to do a de novo review. The other issues are clearly abuse of discretion, which I think counsel did admit. But this is a very simple issue. This was an equitable claim for rescission. It becomes more than obvious if you look at INDIC's complaint and look at what they were asking for. In paragraph 32 of INDIC's complaint, they allege that as a result of a breach of contract, which, of course, is the basis for any rescission claim, whether it be breach of contract, breach of warranty, whatever, that's the basis for a rescission claim. In paragraph 32 of that complaint, INDIC alleges, quote, INDIC has elected to rescind the purchase orders, has notified PPP of its election to rescind the purchase orders, and has requested PPP restore to INDIC the monies paid to PPP for the generator packages. Their prayer for relief was the purchase price less the amount of benefits that they received as a result of having the generator packages. Your Honor, a more explicit claim for rescission I cannot imagine. Now, INDIC claims that, well, wait a minute. Since this claim for rescission was in the contract, that is what transforms this into a contract claim. That's not true, Your Honor. Yes, there was some language in the contract rescissionary. That doesn't transform an equitable claim for relief into a contract claim. Only a judge can grant equitable relief. A jury can't say, oh, exchange back consideration and all this stuff. I'll give you a couple of good examples. What about a contract for the sale of real estate? Certainly, under that contract, the seller has an obligation, and it's in the contract, to give over the real property. If he breaches, what does the buyer do? Not bring an action in law. It brings an action in equity for specific performance. So even though the contract says seller must give the property to buyer, and the seller breaches, that's not a law claim. It's an equity claim. One more example. In the employment context, employees often sign covenants not to complete. Those employment agreements often give the employer the right to seek injunctive relief. Well, that's right in the contract. Employer can get injunctive relief. If the employee breaches the contract, does the employer bring an action in law? No. The employer brings an action in equity, seeking to get the court to get the employee to comply with the terms. Not a jury. A jury cannot give rescissionary relief. Rescissionary relief is exactly what index sought here. So in your opinion, that was the justification for the trial court denying the plaintiff their right to a jury trial? Absolutely, Your Honor. The trial court looked at the relief sought by the plaintiff. That relief was the trial court almost was saying this is obviously rescissionary relief. You couldn't get more explicit in terms of what you're asking for here. You're not asking for diminution in value. You're not asking for that type of contract claim. You're asking for a rescissionary claim. Only I. But they maintain that they were also requesting damages. Your Honor, they? Good point. They were requesting they threw in interest and attorney's fees. You know what? Interest was not available under the contract. It was nowhere in there. They tried to twist it by saying, oh, interest was included in costs because we had banking. We were paying the bank interest fees. Your Honor, that's just not a legitimate argument. The banking fees, there's no evidence that professional power knew about this interest they were paying. There's no evidence there was any conversation or communications about this interest. That was simply not a legitimate claim for relief. The only place that INDEC could have gotten interest for that was in equity. In contract, in statute, it had no claim for that. Now, the attorney's fees, INDEC doesn't cite it made a claim for attorney's fees, but it doesn't cite that there's a right to a trial, to a jury trial, when you claim attorney's fees. All plaintiffs claim attorney's fees, Your Honor. Most of them are denied. In this case, they were citing to the contract, but, again, there's no evidence that the jury was going to give that, or had the right to give attorney's fees to a defendant, or to a plaintiff. In fact, it's almost certain that the judge would have taken that responsibility. Moving on to the other generator sets, again, this, INDEC tries to confuse things by saying the judge said, well, there was a design. There wasn't a design defect. There was a design defect. It doesn't matter. The test applied by the judge with respect to the alleged similar products that INDEC sought to introduce was appropriate. The test has been, Illinois courts have talked about this test in multiple, as the trial court said. He doesn't need to look at federal cases. He doesn't need to look at out-of-state cases. Plenty of Illinois state courts have ruled on this substantially similar issue. The test is, are we talking about the same product? And was it used under substantially similar conditions of use? And, in fact, there was a case cited by a defendant, Connolly v. General Motors, where the court faced the same question. The plaintiff, in that case, alleged a design defect. That wasn't what the court talked about. It didn't matter what the purpose of the evidence was. What mattered was the test applied by the court. The test applied in Connolly and the test applied by the judge today, I'm sorry, in our case, was exactly the same. He looked at, were these the same product? Your Honor, they weren't the same product. If you look at the generator packages, they were sold by Professional Power. They were in a huge semi-tractor trailer truck. The generator sets were standing alone. The generator packages were placed in a huge enclosure on trailer assemblies. They had switchgear attached to them. They were on top of wheels. The generator sets, these manufactured by Kohler, were affixed to the ground, bolted into a ground. General often had no coverings. Any layman, any person looking at these two products would say, these are completely different products. And there's a reason they look so different, because they were used under substantially different conditions. The reason that the generator packages had wheels is because they were shipped all over the country. They were driven to the Black Hills of South Dakota, back to Illinois, down to South Florida in heat, altitude, humidity. The other generator sets used that INDEC wanted to introduce, those things were brought to one customer. They were affixed into the ground, and they were used by that customer mainly as their sole source of power. The generator packages, on the other hand, were by necessity, since they were leased out, temporary sources of power. Backup, if you will, sources of power. And they were there for a few months, and they were brought back. And the main sources of power by those customers were again used by those customers. So the trial court, it doesn't matter what the trial court thought or opined that these were going to be used for. He applied the proper test. Not the same product, not used under substantially similar conditions. Besides, there is no prejudice here, Your Honor. As I mentioned, the trial court talked about notice. That's what he talked about on and on. That was his main basis, because there was a tremendous amount of evidence regarding the notice. This had nothing to do with the notice. There was some statement by a counsel that Mr. Trent, professional powers president, may have loaded these in 2001 or 2002. As an issue matter, there was nothing specific there. But as even a more important matter is, Mr. Trent never learned about the in-debt products. In Perona v. Volkswagen, the defendant issued press releases, recall notices about a broad problem. The court held no. Unless the defendant knows about the specific problems with plaintiff's product, there is not appropriate notice. So therefore, there is no prejudice. And in any event, the trial court made the proper ruling on the exclusion of the evidence. The final issue, Your Honor, is party opponents. Here again, the only case that index cites is Zaragoza. And in Zaragoza, the trial court again used an abuse of discretion standard, which is the appropriate standard here. The trial court did not abuse its discretion. In Zaragoza, it was a you or me. Two defendants, one of them is going down, both being sued by the plaintiff. That has some indicia of reliability. Here, it was completely different. The only one on the chopping block at trial with respect to in-debt was professional power. Professional power was going to go down. It had no guarantees that it was going to get any liability from any third or fourth party. It had a battle after that. In fact, the trial court talked about severing the trial at one point, doing in-debt against professional power, and then, if professional power lost, doing the next trial. Would that have been at all reasonable for professional power to have to be subjected to third and fourth party purported admissions at a trial on its own? Of course not. And there's no legitimate reason for it to have admissions used against it by third and fourth parties at a trial, including those parties. Index simply tries to extend the analysis too much. If you're going to allow admission, an exception to the hearsay rule, by every party, well, that's essentially what you're going to have is no hearsay rule with respect to that. Finally, there is no prejudice here. In addition to the notice issue that I talked about, this has nothing to do with notice. But even more importantly is that INDEC could have called all these witnesses. Most of the witnesses that INDEC was talking about, not only did they issue a Rule 237 notice to, they were sitting right in the courtroom while INDEC was presenting its case. There was, as INDEC said, there was memorandums. There was sworn testimony. At a minimum, these could have been introduced as past recollection recorded, an exception to the hearsay rule. There was no prejudice to INDEC by denying, by the court's ruling. So, Your Honor, that is all my argument I have for you today. Professional Power asks that you affirm the ruling of the trial court granting Professional Power's motion for judgment and affirm the trial court's ruling that INDEC has took issue with today or hold that they are harmless error and therefore dismiss INDEC's complaint with prejudice. Thank you, Mr. Rosenberg. Thank you. Mr. Fogle, some brief rebuttal. Thank you, Your Honor. With respect to notice, I'm just going to try to tick off issues and rebut each point as quickly as I can. While Mr. Norwick, INDEC's generator technician, may have seen some level of vibration during testing, the same level that Mr. Trent from Professional Power saw, they both were there, neither saw the manifestations of that vibration at a site where parts began to break, ever, ever, until 2002. That was the first time anybody saw that. And so until INDEC knew that the vibration level was actually causing damage, actually self-destructing the equipment, it had nothing to put Professional Power on notice of, and there wouldn't have been anything to tell them anyway because Mr. Trent was there. He knew about it just as much as Mr. Norwick did, if not more, frankly, because as one of our offers of proof would have shown, he knew about what happened with some of those other generator sets, which was a fact he never shared with INDEC. And if you accept Professional Power's argument that the seller of a product can effectively spring a party along and say, hey, we're going to try to fix this, we're going to make everything right, and then when everything isn't made right, the party sues, and then you get a claim that, well, you shouldn't have given us so much time, you delayed, and, therefore, you didn't give us adequate notice, that would be contrary to any policy designed to avoid more litigation, any policy designed to encourage cures under the Uniform Commercial Code and can't possibly lead with what the law would like to encourage. Mr. Rosenberg spoke at some length about how the generator packages worked great, nobody had any problems with them, but the reality is the record, and I won't belabor it, is replete with extensive evidence of problems at Black Hills that led the uncontroverted evidence that led Black Hills to cancel that contract at six months when it was an 18-month lease, causing INDEC to lose 12 months of the lease. And if they had worked so well and everything was okay, then INDEC would have had every incentive to lease those units after the U.S. Sugar experience, and it had opportunities in 2004 and 2005, and those opportunities were put into evidence, and INDEC, we believe, made the appropriate corporate decision not to put these dangerous products back into the market in return for getting potential lease revenue and chose not to do that. That is irrebuttable evidence, frankly, that INDEC believed this product was defective. On the jury trial issue, Mr. Rosenberg spent some time referring to Paragraph 32 of the complaint. What he omitted was, or actually didn't really omit, he said we basically just asked for interest but didn't really justify where it was from. Well, the contract specifically says return all amounts paid, not just the purchase price, but the interest used to finance the purchase. That's where the interest comes from. We also specifically sought damages. Frankly, they're attached to the complaint as a Rule 222 affidavit of damages to get into law division. We filed in the law division, not in chancery. Nobody ever objected to that. And we also sought attorney's fees and expert fees, specifically under Paragraph 23 of the contract. Wouldn't possibly have ever been able to seek those in a purely equitable setting. It was clearly a legal setting, and INDEC was entitled to a jury trial. As to the other generator sets, the case law is clear. It is the specific defect alleged that constrains the analysis of commonality. There has to be some constraint. You have to know what you're supposed to look at to determine what has to be similar, and the law in Illinois is clear on that. Mr. Rosenberg goes on at length about how the other generator sets were not similar. I'll leave it at the fact that Professional Power itself told the motion judge, in its motion for summary judgment, that they were, quote, identical. Identical. He didn't say they were substantially similar. He said they were identical, and to come in now and suggest to this court that somehow they were so vastly different I think is inappropriate. He also mentioned the usage. There's absolutely no evidence at trial that the movement on a trailer from one place to another had absolutely any impact at all on vibration. None. No evidence whatsoever. On the party-opponent issue, the Zaragoza case, Mr. Rosenberg said that that case actually had, because it was co-defendants, there was an indicer of liability. In contrast here, there was not. Actually, the Zaragoza case, the court said they were party opponents as co-defendants, even though there weren't claims between them, but there wasn't an indicer of reliability because the one defendant wanted to testify that it was a dog-biting case. Remarkable, some of the cases that make its way up here. But the one defendant wanted to testify that the other defendant's dog had a habit of biting the father, and that it was therefore that defendant's fault for the dog bite. And the court said, no, we're not going to let that in because that other defendant, the one who's going to testify that the admission was made, was the mother of the defendant who wanted to offer the evidence. That didn't have the indicer of reliability. There were no relationships like that here. There were direct privity contract detractors from professional power to Inland to Detroit Diesel to Kohler. They were all joined at the hip. This was a group of individuals that were, that had a common defense. They shared an expert. They say no damages were alleged in the case. They had a damages expert, so if they didn't think damages were being alleged, I'm surprised to hear that now. Mr. Fogel, you need to bring your argument to a close. And I will, Your Honor. I appreciate that. In sum, again, as we requested before, we've asked this court to reverse. We've asked that the debt be granted a jury trial on count one, and as to both counts that the court's erroneous evidentiary rulings, which we lay out in detail, be reversed. Thank you very much for your patience. All right. I want to compliment the parties on their briefs. This matter will be taken under advisement, and the court is.